Commonwealth of Pennsylvania *v.* Adams et al., Appellants.

Argued October 7, 1929.

Before Porter, P. J., Trexler, Keller, Linn, Gawthrop, Cunningham and Baldrige, JJ.

*Frank P. Slattery* and *Robert L. Coughlin,* and with them *Maurice S. Cantor* and *John H. Dando,* for appellants.

*Thomas M. Lewis,* District Attorney, and with him *John H. Bonin,* Assistant District Attorney, and *M. F. McDonald,* for appellee.

Opinion by Cunningham, J., December 12, 1929:

The appellants in the five above entitled appeals were indicted, tried and convicted together in the court below and their separate appeals may be disposed of in one opinion.

In May, 1927, a board of directors for the school dis-

trict of the Township of Hanover, Luzerne County, was appointed by the court. That board and its officers consisted of Raymond Gottshall, president; Stanley Czajkowski, secretary, at a salary of $1,800; John McSweeney, treasurer, at an annual commission of about $5,000; and Anthony E. Adams, all of whom are appellants herein; Peter Wolfe, David Thomas and L. L. Newhart, referred to as minority directors. In September, 1928, the four directors who are appellants herein were removed as the result of ouster proceedings. Shortly thereafter they were indicted, along with Alex Oshirak, the other appellant, a merchant doing business in Wilkes-Barre under the name of Breslau and Lyndwood Supply Company, under an indictment containing eight counts, in which the four directors and Oshirak were charged with having conspired among themselves, and with other persons unknown, to cheat and defraud the school district out of the aggregate sum of $1,239 by means of the fraudulent awarding and execution of certain contracts made with Oshirak for the supplying of furniture, pupils' desks, window shades, etc., for specified school buildings and for the erection of a boiler in one of the buildings.

The first count is general in its terms and specifies the aggregate amount out of which it is averred the district was defrauded; the second and third are based upon awards in 1927 for pupils' desks and charge that the district was defrauded out of $160 upon these contracts; the fourth and fifth relate to the furnishing of window shades and charge that the district was defrauded out of $964; the sixth applies to the erection of the boiler; the seventh relates to an award of a contract for furniture, including desks, in 1928; the eighth charges the making of fraudulent entries in the minute book relative to an alleged "dummy" bid purporting to have been submitted by the C. and S. Furniture Company in competition with Oshirak, but which had, in

fact, been procured by him and fraudulently submitted along with his own bid. The trial judge withdrew this eighth count from consideration by the jury as a distinct charge but submitted the facts relative to the making of the bid as evidence applicable to one of the furniture contracts. The case was submitted on the remaining seven counts; the jury found all the defendants guilty on all counts "excepting the count of repairing of the boiler" with a recommendation of mercy. A new trial was refused by the court in banc and each defendant sentenced to pay a fine of $100 and undergo an imprisonment of from six months to one year.

It is essential to an understanding of the questions raised by the assignments that, even at the expense of considerable space, reference be made to some of the salient facts appearing from the evidence in this voluminous record. Among the material witnesses were W. C. Wint, the clerk for the school district during the period covered by the case, who took notes of the proceedings at the meetings of the directors, subsequently dictated the minutes to a stenographer, Miss Sadie Jones, and after transcription turned them over to Czajkowski, the secretary; F. W. Nyhart, the supervising principal of the district, who, from information furnished by the principals of the respective buildings, prepared the requisitions for the desks, shades, furniture, supplies, etc., which would be required from year to year; and the minority directors. Included in the requisitions for the year 1927-28, prepared by Nyhart, was a "furniture requisition" covering pupils' desks, teachers' desk chairs, window shades and curtains, sewing tables, etc.

For the present we are concerned with the requisition for pupils' desks. Two contracts for desks are covered in the evidence; one awarded and executed under the requisition for 1927-28 and the other, covering desks and other items, awarded under a subsequent

514

requisition for 1928-29, but which had not been executed when the ouster proceedings were instituted. These desks, we gather from the exhibits and the testimony, are priced and referred to as complete desks, including seats, and certain parts of them are also priced and referred to as "rear seats" or "rears." The requisition contains no specifications with respect to the kind or quality of the desks desired except a classification by numbers. One of the exhibits indicates that these numbers range from one to six—number one desks being intended for the accommodation of the largest and number six of the smallest pupils. Nyhart testified that it was the business of the board to specify the kind and quality of desks and shades; that he merely requisitioned the number needed and that the board usually used samples for bidders.

The requisition for 1927-28 covered three classes of desks, Nos. 2, 3 and 4, it being specified, for instance, that thirty-five No. 3 desks and five No. 3 rears were needed for the Buttonwood Building. The total number of desks and rears in that requisition for the four buildings therein mentioned was 292. Publication was made of the fact that sealed proposals would be received for supplies under a number of different classifications, including furniture; that copies of the requisitions were available at the office of the secretary; that bids must be accompanied by a certified check in the amount of $300.

The minutes of the meeting of August 27, 1927, show that two bids were received for desks and rears, one from Scranton Supply Company, the other from Oshirak. Using No. 2 desks as an illustration, the minutes indicate that the Scranton Supply Company offered to supply them f. o. b. for $5.05, set up $5.50, and "rear sets for all sizes" $4.60. Oshirak bid, according to the minutes, upon Nos. 2, 3 and 4 desks as manufactured by three different companies, the last

one mentioned in the bid being the Beckley Cardy Company. His bid for No. 2 desks as manufactured by this company was $5.40 and rears $3.75, plus a charge of $1.85 for "freight and setting up charges on each." All the bids received at this meeting were referred to an investigating committee consisting of Adams, Mc-Sweeney and Thomas. It is proper to note that the bid of the Scranton Supply Company is f. o. b. and does not specify the freight charges. The minutes of the meeting of September 6, 1927, show that Adams, one of the appellants and the purchasing agent for the board, recommended the purchase of 225 desks and 37 rears (a total of 262) of various sizes from Oshirak, not at the prices recorded as his bid but at prices set out in these minutes—the price for No. 2 desks, of which 50 were purchased, being $7.05. The price fixed in the award is considerably in excess of Oshirak's bid for No. 2 desks and this is likewise true of the other classifications of desks and rears. The minutes indicate that on motion of Czajkowski, seconded by Mc-Sweeney, to adopt the recommendation, the directors voting in the affirmative were Adams, Czajkowski, Gottshall, and McSweeney, all of whom are appellants; that Thomas and Wolfe also voted in the affirmative and that Newhart was absent. Wolfe, having been called as a witness by the Commonwealth, was permitted, over the objection of counsel for appellants, to testify that in fact he voted "no" on that motion. Thomas was also called by the Commonwealth and permitted to testify that he voted "no."

Although the award of September 6, 1927, was for but 262 desks and rears Oshirak supplied 292, the number mentioned in the requisition; of these 266 were installed in two school buildings when received, leaving 17 desks and 9 rears in storage; of these, 10 desks and 4 rears were subsequently placed in a school building, leaving 7 desks and 5 rears uninstalled. The matter

of payment for the desks came before the board at the meeting of October 26, 1927. A bill dated October 24th was presented by Oshirak for the 262 desks awarded on September 6th. The bill reads:

" 50 No. 2 seats at $7.05 .............. $352.05
   12 No. 2 rears at $5.05 .............. 60.60
  105 No. 3 seats at $6.85 .............. 719.25
   16 No. 3 rears at $5.05 .............. 80.80
   70 No. 4 desks at $6.75 .............. 472.50
    9 No. 4 rears at $5.05 .............. 45.45
  263 seats erected at $.85 ........... 223.55
                                        ─────────
                                        $2,154.65"

This bill is incorrect as the total number of seats and rears was 262 and the correct total of the bill, using the figures inscribed thereon, should have been $1,954.20. The prices charged on the bill are those specified in the award of September 6th but are higher than the bid recorded in the minutes of August 27th, including $1 on each desk and rear for freight, by varying amounts; for instance, the bid on the first item of 50 No. 2 seats was $6.40, including freight, and the price charged in the bill is $7.05, or an advance of sixty-five cents on each desk. No explanation of these variances was attempted in the testimony. The original bid seems to have been lost; at least it was not placed in evidence. The bill as presented to the board was in the handwriting of Miss Jones, the board's employe. Oshirak's explanation is that he mislaid his invoice from the Beckley Cardy Company and went to the office of the board with the request that a bill be prepared for the 292 desks but, upon being informed that the award of September 6th was for only 262, requested the bill be made up from data in the office for the 262 desks, plus eighty-five cents for their erection. There was evidence that the amount paid by him for

erecting desks was thirty-five cents. The minutes of the meeting of October 26th purported to show that this bill was directed to be paid in the sum of $2,154.65 upon motion of Adams, seconded by Czajkowski, and the order for its payment is signed by Gottshall, Czajkowski and McSweeney. Those recorded as voting in the affirmative were Adams, Czajkowski, Gottshall, McSweeney, Newhart and Thomas, and Wolfe is recorded as voting in the negative. At the trial Thomas testified, under objection, that he voted "no" on this motion and Newhart that he did not recall how he voted. At a meeting on February 15, 1928, upon motion of McSweeney, seconded by Adams, 29 No. 2 desks "were ordered purchased from" Oshirak, Adams, Czajkowski, Gottshall and McSweeney voting in the affirmative and Newhart, Thomas and Wolfe in the negative, and on June 5, 1928, his bill for $231.75 for these additional 29 desks was paid. The desks delivered by Oshirak upon this award were No. 3 desks, but Oshirak claimed that he had been paid for only 29 desks, although he actually delivered 30. Oshirak's explanation of the mistake of $200.45 on the first bill was that he had no knowledge of it until an accountant employed by him to go over his books brought it to his attention and that he was advised by counsel "to ignore that $200 item until I was tried and bring it up in the trial, instead of taking it back to the school district." The minutes show all the directors voting in favor of the payment of the second bill in the sum of $231.75 but Thomas testified that he voted against it. Although some of the 292 desks in the requisition for 1927-28 had not been installed up to the time of the trial, the furniture requisition for 1928-29 included 521 desks, designated alone by numbers. Oshirak was a bidder upon a number of the items in that requisition, including the furniture section, which in turn covered the desks. His bid for No. 2 desks was $9.60 as compared

with his bid of the previous year for No. 2 desks at $5.40, or $6.40 including freight. Oshirak's total bid upon items in the 1928-29 requisition was $9,771.90 and an award was made to him, as shown by the minutes of August 10, 1928, for furniture in the sum of $8,751.-90—a piano, rug and sewing machine having been eliminated.

According to the minutes this award was made on motion of Adams, seconded by Czajkowski, and the directors voting in the affirmative were Adams, Czajkowski, Gottshall, Newhart, McSweeney. The minutes record Thomas and Wolfe as "not voting" but each testified that he had voted "no." The advertisement for bids for that year contained a provision that a cash deposit of $100 would be required for copies of the requisition and that all bids must be accompanied by a certified check in the amount of $300. Bids were received on the 1928-29 requisition on August 7, 1928, at which meeting Oshirak presented his own bid of $9,771.90, accompanied by his certified check, and at the same time placed on the table before the directors a bid purporting to have been made by the C. and S. Furniture Company for the same items in the amount of $9,989.45, which bid had three $100 bills attached to it. This bid and the money were handed to Czajkowski, as secretary, and both disappeared after the meeting; the bid was never found but, during the ouster proceedings, the bills were found by Miss Jones under the lower shelf in the vault of the office of the school district and turned over to the court. Oshirak's story was that, through a friend, Mendel Nelson (not available at the time of the trial), he was placed in touch with Norman Schwartz, who, in partnership with Joseph Corner, was engaged in the furniture business as C. and S. Furniture Company, and arranged with him to make up the dummy bid, and that, not having time to procure a certified check, he (Oshirak) took

three $100 bills from his till, attached them to the "complimentary" bid, as he called it, and deposited that bid along with his own bid on the table at the meeting. Schwartz, called by the Commonwealth, denied that he, or anyone with his authority or knowledge, had anything to do with the preparation of the dummy bid and denied having any conversation with Nelson about the matter. Corner, the other partner, testified that he was confined in a hospital at the time the bids were submitted and knew nothing about the bid.

The contract for window shades and curtains does not require detailed discussion. The requisition of 1927-28 included window shades for four school buildings, the number of shades for each building and the sizes being designated therein. Oshirak was the only bidder and his bid as recorded in the minutes of the meeting of August 27, 1927, was $964. Five bills, all dated October 24, 1927, were rendered for shades: $287 for the Junior High School; $262, Buttonwood Building; $234, Askam Building; $96, Preston Building; and $85, Memorial High. All these bills, except the last, are in the handwriting of Miss Jones. Oshirak testified that he brought his total bill of $964 to the school office and it was divided between the buildings so that each bill would be less than $300—the limit for contracts awarded without competitive bids. They were ordered paid at the meeting of October 26, 1927, upon motion of Adams, seconded by Czajkowski, the affirmative votes being recorded as those of Adams, Czajkowski, Gottshall, McSweeney, Newhart and Thomas, with Wolfe voting "no." Thomas testified that he also voted "no." The orders are all signed by Gottshall, Czajkowski and McSweeney. There was evidence that the prices paid were greatly in excess of the fair market prices. Oshirak admitted that he made a profit of 132% on the shades, their cost to him being $423.11,

but coupled it with a statement that his profit on the whole transaction was only "twenty-four plus per cent." When asked why his bill for 14 shades in the Preston Building was only $96 and his bill for 18 shades of approximately the same size and of the same quality for the Buttonwood Building $262, Oshirak replied: "These prices were just made out under the $300 in order to get my bills paid by the office, that is the only explanation I have. So much for this school and so much for that and totaled it up. Q. It didn't make any difference what they were worth you stuck them in to get under the $300? A. Yes, to comply with the bid." We have not attempted to discuss all the testimony but have endeavored to indicate the grounds for the charge and the nature of the conflicts arising under the evidence. Oshirak, McSweeney and Adams took the stand and made full denial of any participation in, or knowledge of, any conspiracy to defraud the district; Czajkowski and Gottshall did not testify.

The assignments may be classified into those charging error (a) in the admission of evidence, (b) in the charge, and (c) in refusing certain of defendants' points. It is contended in behalf of appellants that the trial judge erred in permitting certain minority directors to testify that they had not voted as their votes were recorded in the minutes. Their counsel assert that the admission of this evidence was violative of the rule that the minutes of a public body, kept pursuant to statutory direction, are conclusive of the facts therein recorded and cannot be contradicted by parol evidence in a collateral proceeding: Whitehead v. School District, 145 Pa. 418. We are not convinced that the evidence here offered amounted to such an impeachment of the minutes as is contemplated by the rule. Czajkowski was the secretary and responsible for the minutes regardless of the assistance he may have had from clerks and stenographers. He and the

three directors indicted with him controlled all the offices and were charged in the indictment with a conspiracy to defraud the district by the awarding of fraudulent contracts and the payment of fraudulent bills presented thereunder. Manifestly, it would be to his interest and that of his alleged co-conspirators, if such conspiracy existed, to have the minutes show the so-called minority directors voting for resolutions alleged by the Commonwealth to have been passed in furtherance of the conspiracy; falsely recording the votes of the other directors would be some evidence of the existence of the conspiracy. No attempt was made to show that the meetings were not in fact held as recorded, or that the actions of the board therein recorded were not taken and supported by a majority of the board. The charge was that a majority of the directors had acted corruptly and in bad faith, thus bringing this case within the well established exception recognized in Whitehead v. School District, supra. The rule and the exception thereto were considered and the authorities cited by this court in Geiser Mfg. Co. v. Frankford Twp., 40 Pa. Superior Ct. 97. In that case the offer which it was held should have been excluded was an offer to prove that, although the minutes purported to show the holding of a meeting of supervisors on a particular date and the taking of certain action thereat, no such meeting was in fact held. It was there stated that the doctrine now invoked by these appellants is not to be carried beyond the limits defined in Whitehead v. School District, supra, and the opinion continues: "Fraud vitiates everything it touches, and it would be unreasonable to hold that any record possesses such a character that no means are left by which it may be made to speak the truth where the finger of fraud has written falsehood into it." Nor are we persuaded that it was error, under the circumstances of this case, to admit in evidence the minutes

of the meetings of August 7 and 10, 1928, showing the receipt of Oshirak's bid of $9,771.90 for furniture and the award to him of the contract for items aggregating $8,751.90. The objection was that these minutes, recorded in a minute book beginning July 2, 1928, had not been signed or approved by the board. The Commonwealth showed by Wint that he had attended the meetings on the specified dates, that the bids were received and the contract awarded, that he had prepared and recorded the minutes in the usual routine and that he had obtained the book produced in court from Czajkowski, the secretary. In admitting the offer of the minutes the trial judge said to counsel for appellants: ''If you wish to attack them, you can do that, but that is a record of what was transacted—as the minutes of the board. If it is not true, it can be shown.'' No effort was made on behalf of appellants to show that the minutes were not accurate.

We have carefully examined the charge in the light of appellants' contention that its general effect was argumentative and that undue prominence was given to the testimony for the Commonwealth and that in behalf of appellants minimized or ignored. Specifically it is charged that the court misquoted some of the evidence and committed an error of law in stating that, as the indictment charged not only the appellants but ''divers other persons to the grand jurors unknown'' with the conspiracy, the jury might convict Oshirak alone if they found that he corruptly agreed with Nelson or Schwartz, or with both, to cheat and defraud the district by submitting the dummy bid. Under the verdict this question becomes moot, but we may say that the instruction was not inconsistent with the views expressed by this court in Com. v. Bonnem, 95 Pa. Superior Ct. 496. The alleged misstatement of evidence was that the requirement of a cash deposit of $100 for copies of the requisition was included in the requisi-

tion of 1927-28 as well as in that of 1928-29, when, in fact, the evidence showed that it appeared only in the latter. McSweeney was a newspaper man and had charge of the advertisements for proposals. He testified in effect that this provision was inadvertently inserted in the requisition of 1928-29 through the following by him of a form prepared by the board's architect in advertising for proposals for building repairs requiring the use of plans and specifications and that no demand had ever been made for payment for supplying copies of requisitions for furniture, etc. In the course of the charge the trial judge submitted to the jury for its consideration the question whether the inclusion of this provision was for the purpose of discouraging bidding and at the same time called attention to McSweeney's explanation stating that if it was true "there is a full explanation as to the requirement of that $100." One of the counsel for appellants interrupted the trial judge and called attention to the fact that the provision had not been inserted in the first requisition. The trial judge repeated that his recollection was that the deposit had been required in connection with the contract for shades. At the conclusion of the charge counsel for the Commonwealth stated that the provision was required only in the requisition of 1928-29 and the court said: "You have heard that statement, gentlemen. Mr. Lewis says that was the testimony, and it shows you again how important it is to refresh your own recollection, as to the time." We think this was an adequate correction of the inadvertent misstatement of the evidence by the trial judge.

Thirty-one points were submitted on behalf of appellants and, with the exception of the twenty-first and those requesting binding instructions, were either read and affirmed at appropriate places in the charge or were covered by the general charge. The twenty-first point covers a page of printed matter in the record; the trial

judge correctly described it as argumentative and stated that the subject matter had been covered in his general charge. Another objection to it is that it begins with the statement that the Commonwealth relied in support of its charge of conspiracy principally upon its attempt to show the payment of excessive prices. The Commonwealth relied upon many additional circumstances and we think the trial judge was justified in declining to affirm this point. The jury was cautioned that it must take the testimony from the witnesses and not from counsel or from the court and was told that the court had not attempted to review all the evidence. It is true that the trial judge propounded a number of pertinent inquiries arising out of the evidence but we think the rights of appellants were fully safeguarded in connection with the submission of these queries. Perhaps the most satisfactory way of illustrating the manner and method of the charge will be to quote that portion referring to the submission of the dummy bid of the C. and S. Furniture Company. After referring to Oshirak's testimony relative to the obtaining of the bid from Schwartz through Nelson, the trial judge said:

"If you believe that bid was furnished by Oshirak, under those circumstances, then that was an unlawful and a dishonest act on the part of Oshirak. The meeting was at ten o'clock. He says the defendant directors and other contractors were there, sitting around a table; that he had no opportunity of getting his check certified, for $300, which had to accompany this bid, and that he attached to the bid three one hundred dollar bills; he says he came into the room where the directors were sitting, and he threw down, as I recall, the C. & S. bid and submitting that with his own bid—two bids, his own and the C. & S. bid.

"If he deposited that bid, in the presence of this board, and they saw him carrying, with his own bid, the C. & S. bid and submitting that with his own bid—

a competitive bid—and these defendants saw it, was that sufficient to arouse the suspicion of business men —letting contracts—for the same man to bring in his competitor's bid? If they saw that, and saw that attached to the C. & S. bid there was no certified check, but three one hundred dollars bills, was their suspicion aroused? Were they a party to this competitive bid of the C. & S. and did they know about it? Was that a part of a scheme, on the part of any one of these directors with Oshirak to get that 'phoney' bid—as it was called? To bring it in there at a higher figure than Oshirak's, for the purpose of letting Oshirak get that contract?

"That bid, and the cash was taken by the secretary, Czajkowski, as I recall Wint's testimony. What became of that bid? Who had it last? The money is here. That money was attached to the bid. Who separated it? If they made a search of the vault, why didn't they find the money before the day on which they did find it? Is it strange to you, as business men, that, after several searches had been made of that vault, that some months afterwards, at the suggestion of the supervising principal, who came in and suggested a search, that they stepped into the vault, and the $300 is recovered, and no bid? Is there a secrecy about that bid, and about this cash—the $300? If there is a secrecy as to that, is it being hidden by any one or more of these directors, and is it being hidden in pursuance of an agreement, or corrupt agreement, on the part of any one or more of these men, directors, with Oshirak?

"Mr. Swartz says that he never signed that bid; never had any conversation with Mr. Nelson, and he wipes his hands clean of it.

"The credibility of Mr. Swartz and Mr. Oshirak is for you. Which one will you believe? Mr. Nelson, unfortunately, is out of the jurisdiction, and is not here.

Mr. Corner, the other member of the firm, seems to have a complete alibi—he was in the hospital at the time, and remained there for some time afterward.

"Gentlemen, that, briefly, is the Commonwealth's claim, on this subject of the furniture [1928 contract]. Was there a combination between any one of these directors, and Oshirak, in connection with the C. & S. bid, and in connection with the letting of that contract, to cheat and defraud this district?

"If Oshirak agreed with the C. & S. to furnish a bid as an accommodation bid, without the knowledge or agreement of any one of these directors, and if these defendant directors had no knowledge that there was any irregularity existing in the C. & S. bid, then you would not be warranted in considering that fact as any indication of an illegal combination, as between them and Oshirak. If Oshirak was perpetrating a fraud upon them, and they knew nothing of it, of course they should be deemed innocent of any part, in connection with this C. & S. bid, bearing in mind that they are not charged here with negligence, or carelessness, or incompetency, but with an unlawful combination or agreement, constituting conspiracy."

In immediate connection with this review of the evidence relating to this matter, the court read and affirmed appellants' 18th, 19th and 24th points, instructing in substance that before the jury would be warranted in inferring that the circumstances relied upon by the Commonwealth to establish the conspiracy logically led to a conclusion of its existence they must find that those circumstances negatived any probability of mistake, error, ignorance, carelessness or negligence on the part of the directors in awarding any of the contracts to Oshirak or in making payments to him; that, if the jury believed that the directors were negligent or incompetent in the conduct of the business of the district, they should consider whether or not the cir-

cumstances relied on by the Commonwealth could be attributed to such negligence and, if so, they would not be justified in inferring the existence of any prior collusive agreement. This was followed by the statement, in the language of the twenty-fourth point, that "It is immaterial that the defendant directors may have been negligent, careless, or incompetent in the management of the affairs of the school district. It will not do to say that they ought to have been more searching in passing upon awards or that they should have known that the prices awarded in any case were excessive. There is no such thing as an inadvertent and negligent conspiracy." The last paragraph of the point was evidently taken from Com. v. Tilly, 33 Pa. Superior Ct. 35, 38. At the conclusion of the charge the trial judge inquired whether there was anything else counsel desired him to say to the jury. With the exception of the matter to which we have already referred, no corrections or additions were suggested. It has been held repeatedly that, under such circumstances, counsel for appellants cannot justly complain in this court either of mistakes in stating facts or of inadequacy in the statement of the evidence.

It was not error to refuse binding instructions in favor of any of the appellants. The question whether the overt acts, in which the indicted directors and contractor were shown to have participated, justified the drawing of an inference that a conspiracy had been entered into by them to defraud the district and that these acts were performed in its furtherance, or whether they justified merely an inference that the indicted directors had been grossly negligent in the performance of their official duties and had been imposed upon by the contractor and misled by their own employes, was, we think, necessarily a question for the jury. That issue was submitted to them with adequate instructions relative to the nature of the offense

charged and the ingredients which must be found in the evidence, beyond a reasonable doubt, before a conviction would be justified. The jury had the benefit of the explanation of Oshirak, Adams and McSweeney, corroborated to some extent by the testimony of employes of the board, of the manner in which the alleged fraudulent bills had been prepared for presentation and of other facts relied upon by the Commonwealth, together with their positive denials of any knowledge of or participation in a conspiracy. The credibility of all the witnesses was for the jury. Whether its members would accept those explanations and conclude that the acts relied upon by the Commonwealth as justifying the inference for which it contended were mere mistakes, due to nothing more serious than inadvertence, incompetence or negligence, was for them and not for the court. We are unable to see that any reversible trial error was committed and therefore overrule all the assignments.

The judgments are severally affirmed and the record remitted to the court below and it is ordered that each defendant appear in that court at such time as he may be there called and that he be by that court committed until he has complied with the sentence or any part of it which had not been performed at the time his appeal was made a supersedeas.